No. 22-11858

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

**UNITED STATES OF AMERICA**,

Plaintiff-Appellee,

v.

**MICHAEL PEYTON GUNN,**

Defendant-Appellant.

---

On Appeal from the United States District Court
for the Southern District of Georgia

---

**BRIEF OF APPELLEE
UNITED STATES OF AMERICA**

---

DAVID H. ESTES
UNITED STATES ATTORNEY

Justin G. Davids
Chief, Appellate Section
Assistant United States Attorney
United States Attorney's Office
Post Office Box 8970
Savannah, GA 31401
(912) 652-4422

No. 21-11858

United States v. Gunn

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

COMES NOW the United States of America, by and through David H. Estes, United States Attorney for the Southern District of Georgia, and files its Certificate of Interested Persons and Corporate Disclosure Statement as follows:

Christine, Bobby L.

Davids, Justin G.

Doe, Jane

Epps, Hon. Brian K.

Estes, David H.

Groover, Tania D.

Gunn, Amanda Howard

Gunn, Michael Peyton

Hall, Hon. J. Randal

Knoche, Karl I.

Lyons, Tara M.

Merzlak, Shawn Michael

C – 1 of 2

No. 21-11858
United States v. Gunn

Nelson, Frank Adam

Wahman, Sheila Grider

No publicly traded company or corporation has an interest in the outcome of this case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is unnecessary in this case. The facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument. *See* Fed. R. App. P. 34(a)(2)(C).

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND
    CORPORATE DISCLOSURE STATEMENT ............................. C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CONTENTS ............................................................... ii

TABLE OF CITATIONS ............................................................... v

STATEMENT OF JURISDICTION ............................................... 1

STATEMENT OF THE ISSUE .................................................... 1

STATEMENT OF THE CASE ..................................................... 1

    I.     Proceedings and Disposition Below ........................................ 1

          A.   Charges. ................................................................ 3

          B.   Gunn raises *Brady* allegation on morning of trial ........... 3

          C.   Trial testimony. ..................................................... 7

                1.   Amanda Gunn. ........................................... 7

                2.   FBI Special Agent Harold Godbee ........................... 8

          D.   Verdict and Sentence. ............................................. 11

    II.    Facts ................................................................... 12

    III.   Standard of Review. ................................................ 12

SUMMARY OF ARGUMENT .................................................. 13

ARGUMENT ........................................................................... 14

    The district court did not abuse its discretion when
it denied Gunn's request to continue his trial because
he was waiting for the government to provide him
with alleged Brady material, where the publicly-
available material was not in the government's
possession, where Gunn still had the opportunity
to cross-examine the witness about the material,
and where Gunn also had access to the material before
trial ..................................................................................... 14

    A.   The government did not commit a *Brady*
         violation when, after Gunn himself informed
         law enforcement of its existence, agents did
         not "screen capture" video that was publicly
         available on the internet. ............................................ 15

         1.   There are several potential standards of
             review. ................................................................ 15

         2.   There is no *Brady* violation because the
             government never possessed the videos. .............. 17

         3.   The evidence was not clearly exculpatory
             at the time the FBI Agent viewed the videos
             and Gunn knew about, and had equal access
             to obtaining, the publicly available videos. .......... 20

         4.   Gunn cannot demonstrate materiality. ................ 23

         B.   Failure to preserve evidence is actually a
         *Youngblood* claim, which Gunn never raised
         before the district court and has not addressed
         on appeal. .................................................................... 26

C.    The district court did not abuse its discretion by denying Gunn's request to continue the trial. ...............................................................29

CONCLUSION .........................................................................30

CERTIFICATE OF COMPLIANCE AND SERVICE.............................31

iv

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Arizona v. Youngblood*, 488 U.S. 51 (1988) ..............................................26

*Brady v. Maryland*, 373 U.S. 83 (1963) ......................................................3

*California v. Trombetta*, 467 US. 479 (1984) .............................26, 27, 28

*Hughes v. Hopper*, 629 F.2d 1036 (5th Cir. 1980) ...................................24

*Illinois v. Fisher*, 540 U.S. 544 (2004) ......................................................28

*Monarch Ins. Co. of Ohio v. Spach*, 281 F.2d 401
    (5th Cir. 1960) ........................................................................................24

*Olszewski v. Spencer*, 466 F.3d 47 (1st Cir. 2006)...................................26

*Parker v. Allen*, 565 F.3d 1258 (11th Cir. 2009).....................................21

*SEC v. Levin*, 849 F.3d 995 (11th Cir. 2017)...........................................12

*United States v. Agurs*, 427 U.S. 97 (1976) .............................................23

*United States v. Baptista-Rodriguez*, 17 F.3d 1354
    (11th Cir. 1994) .....................................................................................24

*United States v. Bender*, 290 F.3d 1279 (11th Cir. 2002) ......................13

*United States v. Brester*, 786 F.3d 1335 (11th Cir. 2015) ......................15

*United States v. Brown*, 598 F. App'x 689 (11th Cir. 2015)...................16

*United States v. Campbell,* 26 F.4th 860 (11th Cir. 2022)......................27

*United States v. Davis*, 787 F.2d 1501 (11th Cir. 1986)..........................22

*United States v. Elbeblawy*, 899 F.3d 925 (11th Cir. 2018)....................13

*United States v. Femia*, 9 F.3d 990 (1st Cir. 1993) .................................26

*United States v. Ford*, No. 05-16276, 2007 WL 1259047
  (11th Cir. Apr. 30, 2007) ........................................................................24

*United States v. Gallardo*, 977 F.3d 1126 (11th Cir. 2020) ..............15, 18

*United States v. Garcia-Solar*, 775 F. App'x 523
  (11th Cir. 2019) ...............................................................................20, 21

*United States v. Hansen*, 262 F.3d 1217 (11th Cir. 2001) ......................16

*United States v. Hernandez*, 864 F.3d 1292
  (11th Cir. 2017) .......................................................................................26

*United States v. Jordan*, 316 F.3d 1215 (11th Cir. 2003) .......................19

*United States v. Kersey*, 130 F.3d 1463 (11th Cir. 1997) .......................15

*United States v. Kubiak*, 704 F.2d 1545 (11th Cir. 1983).......................25

*United States v. Lindsey*, 482 F.3d 1285 (11th Cir. 2007) ......................15

*United States v. Melgen*, 967 F.3d 1250 (11th Cir. 2020) .......................18

*United States v. Meros*, 866 F.2d 1304 (11th Cir. 1989) .........................19

*United States v. Naranjo*, 634 F.3d 1198 (11th Cir. 2011) .....................18

*United States v. Pendergrass*, 995 F.3d 858
  (11th Cir. 2021) ................................................................................12, 17

*United States v. Revolorio-Ramo*, 468 F.3d 771 (11th Cir. 2006)...........27

*United States v. Rigal*, 740 F. App'x 171 (11th Cir. 2018)......................16

*United States v. Rodriguez*, 917 F.2d 1286 (11th Cir. 1990) ...........19, 20

*United States v. Rodriguez*, 935 F.2d 194 (11th Cir. 1991) ..................19

*United States v. Stahlman*, 934 F.3d 1199 (11th Cir. 2019) .................18

*United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017) .........................22

*United States v. Valera*, 845 F.2d 923 (11th Cir. 1988).........................22

*Williams v. Sec'y, Fla. Dep't of Corrs.*, 15-13112,
    2016 WL 10749631 (11th Cir. July 27, 2016) .....................................29

## **Rules**

11th Cir. R. 25-3(a) ...................................................................................31

Fed. R. App. P. 25(c)(1)(D).......................................................................31

Fed. R. App. P. 32(a)(5) ............................................................................31

Fed. R. App. P. 32(a)(6) ............................................................................31

Fed. R. App. P. 32(a)(7)(B) .......................................................................31

Fed. R. App. P. 34(a)(2)(C) .........................................................................i

Federal Rule of Criminal Procedure 29...................................................11

## <u>Statutes</u>

18 U.S.C. § 2251(b) ....................................................................... 1, 2

18 U.S.C. § 3742 .............................................................................. 1

28 U.S.C. § 1291 .............................................................................. 1

## STATEMENT OF JURISDICTION

This Court has jurisdiction over appeals of a district court's final order, under 28 U.S.C. § 1291, and over criminal sentences, under 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUE

Did the district court abuse its discretion when it denied Gunn's request to continue his trial because he was waiting for the government to provide him with alleged *Brady* material, where the publicly-available material was not in the government's possession, where Gunn still had the opportunity to cross-examine the witness about the material, and where Gunn also had access to the material before trial?

## STATEMENT OF THE CASE

### I.    Proceedings and Disposition Below.

#### A.    *Charges.*

On February 6, 2020, a U.S. Magistrate Judge in the Southern District of Georgia issued a federal criminal complaint charging Gunn with sexual exploitation of a child, in violation of 18 U.S.C. § 2251(b). *See United States v. Gunn*, No. 1:20-mj-007 (S.D. Ga. filed Feb. 7, 2020)

1

(MJ Doc. 3).[1]  On February 11, 2020, the magistrate court appointed counsel to Gunn and held an initial appearance.  *Id.* (MJ Docs. 16 (text order), 18 (minute entry).)

Subseqently, the grand jury charged Michael Peyton Gunn in a superseding indictment with a sex-trafficking conspiracy (Count 1), sex trafficking of a child (Count 2), enticement of a child to engage in sexual activity (Count 3), production of child pornography by a parent (Counts 4 through 7), possession of child pornography (Count 8), and obstruction of a child sex trafficking investigation (Count 9).  (Doc. 153; PSR ¶¶ 5-8.)[2]  Approximately 11 days before trial, Gunn's wife and co-defendant, Amanda, pled guilty under a cooperation agreement to the conspiracy charge.  (Docs. 232, 233; PSR at 2.)

---

[1] "MJ Doc." refers to to the magistrate court's ECF docket in Case No. MJ 120-007 (S.D. Ga.).

[2] "Doc." refers to the district court's ECF docket in Case No. CR 120-014 (S.D. Ga.).  "PSR" refers to the presentence investigation report revised on April 6, 2022.

### B.    *Gunn raises* Brady *allegation on morning of trial.*

Gunn's trial began on November 15, 2021.  (Doc. 241.)  On the morning of the first day, Gunn's attorney raised "a possible violation of *Brady*"[3] with the district court; however, the attorney stated the government's actions were not intentional or made in bad faith.  (Doc. 324 at 5.)[4]  The attorney explained that "in February of 2020 Special Agent Godbee reviewed several videos on a website called PornHub that were of the co-defendant in this case, Amanda Gunn."  (Doc. 324 at 5.)  In these videos, according to the attorney, Amanda "read some sort of script . . . ."  (Doc. 324 at 5.)  Gunn's attorney believed that Amanda would testify that she was forced to make these videos by her husband, Michael Gunn.  (Doc. 324 at 5-6.)  The attorney explained the videos were impeachment material for the jury to determine whether Amanda was actually forced to make those videos. (Doc. 324 at 6.)  Further, the videos, the attorney believed, were exculpatory to show that Amanda "had this

---

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

[4] "Doc. 324" is a copy of the trial transcript.

deviant sexual lifestyle and [was] more likely to be the person to have committed these acts against the minor . . . ." (Doc. 324 at 6.)

Gunn's counsel acknowledged that these videos were not currently in the government's possession, although the government was attempting to obtain them from PornHub. (Doc. 324 at 7.) Gunn's attorney stated, "I am not sure why in 2020 when Special Agent Godbee saw these videos he wasn't able to simply capture them through a screen recording or something like that and be able to provide those to us." (Doc. 324 at 7.) The attorney requested a continuance of the trial, presumably to allow the government additional time to obtain the videos. (Doc. 324 at 6-7.)

The government contested that the videos were exculpatory, and it anticipated that Amanda would not deny their existence, but she would likely claim Gunn forced her to participate. (Doc. 324 at 7.) Although the government acknowledged that Special Agent Godbee was able to view one ("but not all") of the videos on February 23, 2020, it explained that the videos were never in its possession, which is why it had obtained and served a search warrant on PornHub's owner. (Doc. 324 at 7-8, 16.) While the owner of PornHub had sent links to the videos, the government

4

still was unable to actually download them, and alternative methods of obtaining the videos were unsuccessful.  (Doc. 324 at 8, 9.)

Gunn's attorney responded by claiming the videos were in the government's possession because the agent "has the means and resources to capture the videos at [the time he viewed them] and at this point the videos have been taken down off of PornHub based on the government's investigation and contacting PornHub regarding these."  (Doc. 324 at 9.) As a result, Gunn no longer had any way to review the videos.[5]  (Doc. 324 at 9.)

The government countered that the defense had known about the videos' existence from the beginning, and "[t]hey were just as accessible and I would argue that [they were] even more accessible to [defense counsel] and the defendant than to the United States."  (Doc. 324 at 12.) According to the government, Gunn "mentioned those videos to the FBI agents the first time they visited his house" on February 5, 2020.  (Doc. 324 at 13.)  While Gunn apparently did not tell agents the videos were on

---

[5] Some of the videos may have been still available to view on the internet as of September 2021.  (Doc. 324 at 20.)

PornHub, he did make "a spontaneous statement about videos of his wife being on the internet having sex with other men . . . ." (Doc. 324 at 14.)

In a subsequent interview with Amanda, she explained that videos of her were uploaded to PornHub. (Doc. 324 at 15.) The government disclosed all this information in the first round of discovery made in February 2020. (Doc. 324 at 15, 16, 20.) Thus, "if [Gunn] thought those videos were important to his defense, he could have asked his attorney to go ahead and screenshot those videos." (Doc. 324 at 13.) The government noted that "[t]he issue of PornHub has been in existence since the beginning of this case," but that the first time Gunn asserted a *Brady* violation was the morning of trial on November 15, 2021. (Doc. 324 at 17.)

Gunn's attorney indicated that he only realized they were "going to be crucial to Mr. Gunn's defense" over the weekend before trial, especially since Amanda had pled guilty and was going to be a government witness. (Doc. 324 at 18.) The government responded that Gunn was certainly able to cross examine Amanda about the videos. (Doc. 324 at 19-20.)

The district court explained the "threshold issue" for this alleged *Brady* issue was whether the videos were actually in the government's possession. (Doc. 324 at 21.) "[T]he simple answer to that is no." (Doc. 324 at 21.) The court stated, "the fact is [the government] do[es] not have possession, custody or control of those videos." (Doc. 324 at 21.) Thus, there was no *Brady* violation and the trial could proceed. (Doc. 324 at 21.)

### C.   *Trial testimony.*

#### 1.   *Amanda Gunn.*

At trial, Amanda testified that, at one point, Gunn told her that a gang demanded that she be raped by several men.[6] (Doc. 324 at 293.) She explained Gunn made her drink alcohol and take pills, then "men started showing up" at their home, where she had sex with them. (Doc. 324 at 293.) Gunn took pictures and videos while this happened, and later he posted the videos to the PornHub website. (Doc. 324 at 293-94.)

---

[6] This was part of a larger scheme in which Gunn convinced his wife that the gang (MS-13) was after them and would kill the family, unless she engaged in prostitution and other sex-acts to appease them. (Doc. 324 at 287-93; PSR ¶ 18.)

7

Next, Gunn's attorney cross-examined Amanda regarding the pictures and videos.  (Doc. 324 at 331-32.)  She denied Gunn was not responsible for the videos and pictures being uploaded to the internet. (Doc. 324 at 332.)  Gunn's attorney asked Amanda if she was claiming that Gunn uploaded the pornography videos to the internet "to avoid responsibility for what [she] did and not anything that [Gunn] did."  (Doc. 324 at 340.)  Amanda stated, "No sir."  (Doc. 324 at 340.)

## 2. *FBI Special Agent Harold Godbee.*

The case agent, FBI Special Agent Harold Godbee, also testified at trial.  (Doc. 324 at 392.)  On February 5, 2020, Special Agent Godbee visited with Gunn and Amanda at their house, after determining their minor daughter had appeared in some photographs online.  (Doc. 324 at 405-09.)  During this conversation, Gunn told Special Agent Godbee that Amanda "had been unfaithful" in their marriage, which Special Agent Godbee found "a little weird" because he did not "know why that had come up when we're talking about their little girl."  (Doc. 324 at 409.) After confirming the minor girl was in the house, Special Agent Godbee left, although he felt "something was off."  (Doc. 324 at 410-12.)

8

On February 6, 2020, Special Agent Godbee was provided another pornographic picture of the minor child, but this time he could see a man's sneaker as well. (Doc. 324 at 413-14.) This suggested that "there was someone in the room at least when the little girl was either taking these pictures or having these pictures taken." (Doc. 324 at 414, 415-16.) Later that same day, law enforcement conducted a consent search at Gunn's residence. (Doc. 324 at 420.) As they were about to end the search, Special Agent Godbee found what looked like the sneaker on a shoe rack behind the front door. (Doc. 324 at 423, 424-25.) The minor child confirmed those were Gunn's shoes, and that Gunn had also taken the photograph in question. (Doc. 324 at 425, 571.) At that point, Special Agent Godbee did not know of Amanda's involvement in the crime. (Doc. 324 at 425-27.) Special Agent Godbee arrested Gunn that day.[7] (Doc. 324 at 427.)

On cross-examination, Special Agent Godbee confirmed that on February 5, 2020, law enforcement did not have any evidence that the minor child "was in harm's way more than she possibly could have been

---

[7] A federal criminal complaint was issued against Gunn that day. *See Gunn*, No. 1:20-mj-007 (MJ Doc. 3).

9

taking selfies." (Doc. 324 at 528.) He reiterated that, on February 5, Gunn told him of Amanda's infidelity. (Doc 324 at 531.) Special Agent Godbee confirmed that Gunn told law enforcement that Amanda "had been on the internet performing sexual acts before." (Doc. 324 at 531, 542.)

Amanda also discussed the videos that day with Gunn and Special Agent Godbee. (Doc. 324 at 542.) Special Agent Godbee testified that he found and reviewed seven of Amanda's PornHub videos on February 23, 2020. (Doc. 324 at 531-34.) Gunn's attorney had Special Agent Godbee read the sexually-explicit titles of the videos to the jury. (Doc. 324 at 533-34.) Special Agent Godbee stated he thought he saw Gunn in one of the videos, but "could not be sure." (Doc. 324 at 534.) He did not have any of the videos in his possession. (Doc. 324 at 534.) While Special Agent Godbee acknowledged he had "the ability to screen record or take screenshots of these videos," he explained that "[a]t the time this was very early on [in the investigation] and PornHub is not an illegal site and the fact that pictures of this woman were on or videos were on this site I felt that it was more prudent to go the official route and get a search warrant for this site for these accounts which we did." (Doc. 324 at 534.)

10

Gunn's attorney asked if, absent her later statements that she was forced to make the videos, Amanda's behavior in the videos was consistent with masochism.  (Doc. 324 at 534.) Special Agent Godbee responded:

SA Godbee:  You're asking if I knew nothing else, that Amanda had never told me anything, and I just looked at these videos?

Gunn Attorney: Yes, sir.

SA Godbee:  This would be consistent with a person engaging in what I would say is some sort of deviant sexual behavior, masochism, sadomasochism, however you want to say it, where they're being used.

(Doc. 324 at 535.)

## D.   *Verdict and Sentence.*

At the close of the evidence, Gunn moved for acquittal under Federal Rule of Criminal Procedure 29, asserting the evidence was insufficient for conviction.  (Doc. 324 at 583.)  The district court denied the motion.  (Doc. 324 at 584-90.)  The jury found Gunn guilty on all counts.  (Docs. 244, 254.)

11

Gunn subsequently filed another motion for judgment of acquittal or a new trial. (Doc. 256.) Again, this was based upon insufficient evidence. (Doc. 256.) The court denied this motion as well. (Doc. 274.)

The PSR calculated a total offense level of 43 and a criminal history category of I, resulting in an advisory guidelines range of life imprisonment. (PSR ¶¶ 137, 140, 168.) On May 25, 2022, the district court sentenced Gunn to life imprisonment on Counts 1 through 3, 30 years' imprisonment on Counts 4 through 7, and 25 years' imprisonment on Count 9, all to run concurrently. (Doc. 314 at 3.)

Gunn timely filed a notice of appeal. (Doc. 316.)

## II.    Facts.

The immediately preceding section contains all facts necessary for proper resolution of this appeal.

## III.    Standards of Review.

A district court's denial of a motion to continue trial is reviewed for abuse of discretion, and there is no error "'unless it is arbitrary and unreasonable and severely prejudices the moving party.'" *United States v. Pendergrass*, 995 F.3d 858, 870 (11th Cir. 2021) (quoting *SEC v. Levin*, 849 F.3d 995, 1001 (11th Cir. 2017)). Alleged *Brady* violations are

reviewed de novo. *United States v. Elbeblawy*, 899 F.3d 925, 933 (11th Cir. 2018). But, if "the defendant did not precisely articulate a *Brady* violation in his or her motion for new trial, this court need only conduct a plain error review." *United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002) (internal quotation marks omitted).

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion when it declined to grant Gunn's request to continue trial. Although Gunn asserted a potential *Brady* violation because the government had not provided him copies of the PornHub videos, which he intended to use for impeachment against a witness, the district court did not arbitrarily conclude the evidence was not in the government's possession and Gunn has not shown he was severely prejudiced by the continuance denial. Therefore, this Court should affirm the district court's decision.

## ARGUMENT

**The district court did not abuse its discretion when it denied Gunn's request to continue his trial because he was waiting for the government to provide him with alleged *Brady* material, where the publicly-available material was not in the government's possession, where Gunn still had the opportunity to cross-examine the witness about the material, and where Gunn also had access to the material before trial.**

On the morning of trial, Gunn informed the district court of an alleged *Brady* violation. (Doc. 324 at 5-6.) He asserted that there had been pornographic videos of Amanda Gunn—Gunn's (ex) wife, co-defendant, and co-conspirator—on an internet website called PornHub, and that those videos were impeachment evidence against Amanda, who was now a government witness. (Doc. 324 at 6.) Gunn stated that a government agent violated *Brady* by failing to "screen record" these videos when he initially watched them, and then provide them to the defense. (Doc. 324 at 7.) Thus, Gunn believed, the district court should continue the trial until the government obtained the videos from PornHub via a search warrant.

14

The district court correctly concluded there was no *Brady* violation because the government never possessed the videos. In any event, Gunn had equal access to the materials because as early as the first day he spoke with law enforcement, he was aware of the videos' existence and could have obtained them himself. In fact, Gunn had an attorney even before law enforcement viewed the videos. For these reasons, the district court did not abuse its discretion by denying Gunn's request for a trial continuance.

**A.**  **The government did not commit a Brady *violation when, after Gunn himself informed law enforcement of its existence, agents did not "screen capture" video that was publicly available on the internet.***

**1.**  ***There are several potential standards of review.***

Normally, this Court conducts a de novo review of alleged *Brady* violations. *See United States v. Brester*, 786 F.3d 1335, 1338 (11th Cir. 2015). But, where a defendant fails to raise the *Brady* issue in his motion for new trial, this Court only reviews for plain error. *See United States v. Gallardo*, 977 F.3d 1126, 1142 (11th Cir. 2020); *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007); *United States v. Kersey*, 130 F.3d 1463, 1465 (11th Cir. 1997).

15

Although Gunn did raise the *Brady* issue pretrial, he did not raise it again either at the close of the evidence or in his motion for new trial. (Doc. 324 at 583; Doc. 256.)  Arguably raising the issue pretrial is not enough to preserve the issue because one of the requirements to finding a *Brady* violation is materiality.  *See United States v. Rigal*, 740 F. App'x 171, 174 (11th Cir. 2018); *United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001).  "For *Brady* purposes, evidence is material if a reasonable probability exists that, had the evidence been disclosed, the outcome of the proceeding would have been different."  *Rigal*, 740 F. App'x at 174.  Given this, it is almost impossible for a district court to conclude, pretrial, whether there has been a *Brady* violation because it cannot determine, in a vacuum, whether it is reasonably probable that the outcome of the future trial would be different.  Thus, it would make sense to require a defendant to reassert his *Brady* violation after the jury's verdict in order to properly preserve it for appeal.  *See United States v. Brown*, 598 F. App'x 689, 692 (11th Cir. 2015) ("The government neither possesses nor suppresses information under *Brady* unless the information is available to the government at some time *before the conclusion of the trial*." (emphasis added)).  Because Gunn did not raise

*Brady* in his motion for new trial, any *Brady* claim is probably subject to plain error.

But, in this case, Gunn actually frames the issue as whether the district court erred by allowing the trial to go forward despite his request for a continuance.  (Gunn Br. 4.)  But this Court reviews a denial of a motion to continue trial for abuse of discretion.  *See Pendergrass*, 995 F.3d at 870.  Gunn has certainly preserved his objection to the commencement of trial; however, that does not necessarily translate into reviewing his *Brady* violation de novo.

Ultimately, the exact standard is immaterial because whether it is de novo, abuse of discretion or plain error, Gunn's claim fails.

### 2. *There is no* Brady *violation because the government never possessed the videos.*

In order to a show a *Brady* violation, Gunn must demonstrate that: "(1) the prosecution possessed evidence favorable to him, including impeaching evidence; (2) he did not possess the evidence and could not have obtained it with due diligence; (3) the prosecution suppressed the evidence; and (4) had the evidence been revealed to the defendant, it is reasonably probable that the outcome of the proceeding would have been

different." *Gallardo*, 977 F.3d at 1142; *see also United States v. Melgen*, 967 F.3d 1250, 1264 (11th Cir. 2020) (explaining defendant has burden of establishing all elements of *Brady* violation). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Stahlman*, 934 F.3d 1199, 1229 (11th Cir. 2019) (internal quotation marks omitted).

Here, the district court correctly concluded that Gunn failed to meet his burden demonstrating the government possessed the PornHub videos. (Doc. 324 at 21.) Although the FBI agent viewed the videos on PornHub, a publicly available website, he did not download or otherwise "screenshot" them. (Doc. 324 at 5, 7-8, 16, 531-34.) The government served a search warrant on PornHub in order to obtain the videos, but as of trial, the website had not provided working copies. (Doc. 324 at 7-9, 16.) Thus, the government did not suppress the videos because it did not have the videos in its possession. *See United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011) (explaining *Brady* "applies only to information possessed by the prosecutor or anyone over whom he has authority" (internal quotation marks omitted)).

18

Gunn contends the government possessed the PornHub videos because it *could have* recorded them from the computer screen somehow. (Gunn Br. 6-7.)  *See United States v. Jordan*, 316 F.3d 1215, 1252 n.81 (11th Cir. 2003) ("However, mere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove 'materiality.'").  But Gunn cites no caselaw holding that just because the government could have somehow obtained evidence from an otherwise publicly available source, that is the equivalent of the government possessing evidence for *Brady* purposes.  *See United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989) ("A prosecutor has no duty to undertake a fishing expedition in other jurisdictions in an effort to find potentially impeaching evidence every time a criminal defendant makes a *Brady* request for information regarding a government witness.").

To the contrary, Eleventh Circuit caselaw demonstrates the government did not possess the videos in this case.  For example, in *United States v. Rodriguez*, 917 F.2d 1286 (11th Cir. 1990)[8], this Court held there was no *Brady* violation because the government technically

---

[8] Vacated in part on other grounds by *United States v. Rodriguez*, 935 F.2d 194 (11th Cir. 1991).

did not possess several audio tapes after they had been lost.  *See id.* at 1291 ("Leon and Hernandez do not dispute the government's representation that the tapes have been lost. Materials not possessed by the government cannot be suppressed within the meaning of *Brady*.").  In *United States v. Garcia-Solar*, 775 F. App'x 523 (11th Cir. 2019), the defendants complained that the government violated *Brady* by destroying certain evidence prior to trial.  *Id.* at 529.  Still, this Court reasoned that "no *Brady* violation occurred" "because [the defendants] have not established that the government possessed any evidence that was actually favorable but suppressed it when they requested it."  *Id.* at 530.

Because Gunn fails to establish the government actually possessed the PornHub videos, his *Brady* claim fails.  This Court may affirm the district court on this basis alone.

### 3. *The evidence was not clearly exculpatory at the time the FBI Agent viewed the videos and Gunn knew about, and had equal access to obtaining, the publicly available videos.*

Gunn's *Brady* claim fails for several other reasons too.  First, Gunn presents no evidence establishing that the exculpatory value of the videos

was apparent at the time FBI Special Agent Godbee reviewed the videos in February 2020. *Id*. at 530 (explaining defendants "have not established that any of the [alleged *Brady*] evidence possessed an exculpatory value that was apparent at the time that it was destroyed"). Indeed, Special Agent Godbee testified that when he reviewed the videos, it "was very early on" in the investigation. (Doc. 324 at 534.) He also understood that PornHub was not an illegal website, and, under cross examination, he admitted that until Amanda's later statements, the videos were "consistent with a person engaging in what I would say is some sort of deviant sexual behavior." (Doc. 324 at 534-35.) Even Gunn's attorney admitted that he did not realize the videos were "crucial to Gunn's defense" until the weekend before trial. (Doc. 324 at 18.) Based on this, Gunn has not shown the videos' exculpatory nature was evident at the time law enforcement initially viewed the videos.

Relatedly, Gunn was well aware of the videos from the start of the investigation and had equal access to them. *See Parker v. Allen*, 565 F.3d 1258, 1277 (11th Cir. 2009) ("[T]here is no suppression [under *Brady*] if the defendant knew of the information or had equal access to obtaining it."). Gunn himself was the person who informed Special Agent Godbee

of the videos' existence the first time they spoke on February 5, 2020. (Doc. 324 at 12-14, 531, 542.)  On February 6, 2020, Gunn was charged by federal criminal complaint and, by February 11, 2020, he had an attorney. *See Gunn*, No. 1:20-mj-007 (MJ Docs. 3, 16).  Thus, Gunn knew he was charged with a crime and he had an attorney 12 days *before* Special Agent Godbee even viewed the PornHub videos.  The government also disclosed all of this information to Gunn in the first round of discovery.  (Doc. 324 at 15, 16, 20.)

Given that Gunn was already aware of the videos prior to his arrest, and that he had an attorney within five days of being charged (and only six days after first informing law enforcement about the videos), he has not demonstrated that he could not have obtained the videos himself with due diligence.  *See United States v. Stein*, 846 F.3d 1135, 1147 (11th Cir. 2017) (explaining defendant "made no effort to establish" that he could not have obtained a publicly available document despite reasonable diligence); *United States v. Valera*, 845 F.2d 923, 927-28 (11th Cir. 1988) ("'[T]here is no *Brady* violation when the accused or his counsel knows before trial about the allegedly exculpatory information and makes no effort to obtain its production.'"); *United States v. Davis*, 787 F.2d 1501,

1505 (11th Cir. 1986) ("This court has subsequently held that the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources.").

### 4.    *Gunn cannot demonstrate materiality.*

Gunn speculates that the videos would have shown that Amanda was not being forced to do anything.  (Gunn Br. 8.)  He also speculates that he was not in any of the videos.[9]  (Gunn Br. 8.)  Thus, Gunn concludes that this would have allowed the jury to "conclude [Amanda], solely, was responsible for the exploitation of the minor child."  (Gunn Br. 8.)  All of this, of course, is conclusory and speculative.  "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."  *United States v. Agurs*, 427 U.S. 97, 109-10 (1976).

Gunn fails to establish a reasonable probability that the outcome of his trial would have been different had the videos been produced to him.

---

[9] At trial, Special Agent Godbee testified that he thought he saw Gunn in one of the videos, but "could not be sure."  (Doc. 324 at 534.)

No one denied the existence of the videos or their contents,[10] and Gunn had an opportunity to cross-examine Amanda and Special Agent Godbee about the videos. *See United States v. Ford*, No. 05-16276, 2007 WL 1259047, at *3 (11th Cir. Apr. 30, 2007) ("There was no prejudicial *Brady* violation because the defendants were given an opportunity to cross-examine the witness regarding the grant of use immunity."); *cf. United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1366 (11th Cir. 1994) ("[A defendant] is entitled only to an opportunity for effective cross-examination, not cross-examination that is effective 'in whatever way, and to whatever extent, the defense might wish.'" (cleaned up)). According to Gunn, the videos were mostly impeachment evidence against Amanda; however, such evidence rarely is material enough to change the outcome of an entire trial. *See Hughes v. Hopper*, 629 F.2d 1036, 1039 (5th Cir. 1980) ("The ultimate test that any Brady claim must meet is whether the prosecutor's omission is of sufficient significance to result in a denial of petitioner's right to a fair trial. . . . As this Court noted, impeachment evidence can rarely meet this test."); *cf. Monarch*

---

[10] There is no evidence that the minor child was in these particular videos, making them, at most, impeachment material against Amanda.

24

*Ins. Co. of Ohio v. Spach*, 281 F.2d 401, 412 (5th Cir. 1960) ("But impeachment evidence can rarely be classified as so decisive in nature that it would in all reasonable probability have a significant effect on the outcome.").

And, as the district court explained in denying Gunn's motions for judgment of acquittal and for new trial, the evidence was overwhelming against Gunn.[11] (Doc. 274 at 3-10; Doc. 324 at 584-90.) *See United States v. Kubiak*, 704 F.2d 1545, 1551 (11th Cir. 1983) ("The overwhelming evidence of guilt in this case belies any notion that the discovery material might have created a reasonable doubt."). In addition to Amanda, the minor child victim testified against Gunn, explaining what was done to her and who was responsible. (Doc. 274 at 4-10; Doc. 324 at 584-90.) There was also audio recordings of Gunn's statements to law enforcement, the testimony of a man who paid to have sex with the minor victim (Jonathan Grantham), and the testimony of law enforcement about the analysis of computers, photographs, videos and the internet. (Doc. 274 at 4-10; Doc. 324 at 584-90.) Gunn has not demonstrated that,

---

[11] Gunn does not challenge the sufficiency of the evidence on appeal.

25

given the other evidence in this case, there is a reasonable probability that he would not have been convicted had the videos been provided to him.

**B.** ***Failure to preserve evidence is actually a* Youngblood *claim, which Gunn never raised before the district court and has not addressed on appeal.***

Gunn's complaint about the government failing to preserve the PornHub videos is actually, at best, a *Youngblood*[12] claim. *See United States v. Hernandez*, 864 F.3d 1292, 1306 (11th Cir. 2017). "The Supreme Court's decisions in *Trombetta*[13] and *Youngblood* govern the constitutionality of the nondisclosure of evidence in 'cases in which the government no longer possesses the disputed evidence.'" *Olszewski v. Spencer*, 466 F.3d 47, 55 (1st Cir. 2006); *see also United States v. Femia*, 9 F.3d 990, 993 (1st Cir. 1993) ("The Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two distinct universes. *Brady* and its progeny address exculpatory evidence still in the government's possession. *Youngblood* and *Trombetta* govern cases in

---

[12] *Arizona v. Youngblood*, 488 U.S. 51 (1988).

[13] *California v. Trombetta*, 467 US. 479 (1984).

which the government no longer possesses the disputed evidence."). Gunn did not argue a *Youngblood* claim in the district court and he does not present it in his appellate brief. Therefore, he has forfeited the issue.[14] *See United States v. Campbell*, 26 F.4th 860, 872-73, 875 (11th Cir. 2022) ("In most cases, an issue abandoned on appeal should still be dismissed without reaching the merits.").

Even if considered, there is no plain error under *Youngblood*. "'In order to show that the loss of evidence by the government constitutes a denial of due process, the defendant must show that the evidence was likely to significantly contribute to his defense.'" *United States v. Revolorio-Ramo*, 468 F.3d 771, 774 (11th Cir. 2006) (quoting *Trombetta*, 467 U.S. at 488). The PornHub video evidence was essentially impeachment material, and Gunn still had the opportunity to cross-examine Amanda and Special Agent Godbee about the videos (which no one denied either their existence or their contents). Thus, it cannot be said the videos were likely to *significantly* contribute to Gunn's defense.

---

[14] The government contends that Gunn meets none of the exceptions to the forfeiture rule. *See Campbell*, 26 F.4th at 873.

Further, "'[t]o meet this standard of constitutional materiality, evidence must possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Id*. (quoting *Trombetta*, 467 U.S. at 489). Again, for the same reasons detailed above, Gunn has not shown that the exculpatory value of the videos was apparent at the time Special Agent Godbee viewed them in February 2020. And, as discussed above, Gunn cannot demonstrate he was unable to obtain comparable evidence by other reasonably available means because he was the one who informed law enforcement about the videos' existence. And he had an attorney before law enforcement viewed the vidoes on the internet. Thus, Gunn had ample opportunity to get his own copies of those videos well before trial.

Lastly, "'[F]ailure to preserve this "potentially useful evidence" does not violate the due process clause "unless a criminal defendant can show bad faith on the part of the police."'" *Id*. (quoting *Illinois v. Fisher*, 540 U.S. 544-547-48 (2004)). Gunn's attorney specifically acknowledged to the district court that he did not believe the government acted intentionally or in bad faith. (Doc. 324 at 5.) Nothing in the record

suggests that law enforcement acted in bad faith by not "screen recording" the videos. To the contrary, Special Agent Godbee testified that when he first viewed the videos, it "was very early on" in the investigation and he "felt it was more prudent to go the official route and get a search warrant for this site for these accounts." (Doc. 324 at 534.) This is not enough to establish bad faith. *See, e.g., Williams v. Sec'y, Fla. Dep't of Corrs.*, No. 15-13112, 2016 WL 10749631, at *5 (11th Cir. July 27, 2016) ("This is insufficient to show a *Youngblood* violation, which requires a showing of 'bad faith on the part of the police' and not merely a 'failure to preserve potentially useful evidence.'").

## C. *The district court did not abuse its discretion by denying Gunn's request to continue the trial.*

Based on the above, the district court did not arbitrarily and unreasonably deny Gunn's request to continue the trial. He has also not demonstrated that he was severely prejudiced by the denial, especially considering he still was able to cross-examine the witnesses about the videos and their contents. Moreover, overwhelming evidence of Gunn's guilt was presented at trial.

## CONCLUSION

The district court did not abuse its discretion when denied Gunn's request to continue the trial for an alleged *Brady* violation. There was no violation because the government did not have the evidence in its possession. Additionally, Gunn had equal access to the publicly available videos, which were ultimately not material. Finally, Gunn abandoned on appeal any *Youngblood* claim for failure to preserve evidence; even so, there was no *Youngblood* violation in this case. For these reasons, the United States respectfully requests that this Court affirm the district court's decision.

Respectfully submitted,

DAVID H. ESTES
UNITED STATES ATTORNEY

***/s/ Justin G. Davids***

Justin G. Davids
Chief, Appellate Section
Assistant United States Attorney
Missouri Bar No. 57661
*justin.davids@usdoj.gov*

Post Office Box 8970
Savannah, Georgia 31412
Telephone Number: 912-652-4422

30

## <u>CERTIFICATE OF COMPLIANCE AND SERVICE</u>

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word for Microsoft 365.

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 5,750 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief was filed today through this Court's ECF system, and thereby served on appellant Michael Gunn's counsel of record, Shawn M. Merzlak, at his Court-registered e-mail addresses, pursuant to Fed. R. App. P. 25(c)(1)(D) and 25(c)(2), and 11th Cir. R. 25-3(a).

This December 23, 2022.

Respectfully submitted,

DAVID H. ESTES
UNITED STATES ATTORNEY

*/s/ Justin G. Davids*

Justin G. Davids
Chief, Appellate Section
Assistant United States Attorney
Missouri Bar No. 57661
*justin.davids@usdoj.gov*

31

Post Office Box 8970
Savannah, Georgia 31412
Telephone Number: 912-652-4422